DEPOSITION OF CAITLIN HOWARD

1

```
 1           UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
 2
     Case No. 14-cv-02931-WJM-CBS
 3   ---------------------------------

 4   HEIDI WODIUK,

 5         Plaintiff,

 6   v.

 7   PUEBLO COUNTY SHERIFF'S DEPARTMENT
     OFFICER CAITLIN GRAZIANO, in her
 8   individual and official capacities,

 9         Defendant.

10

11   ----------------------------------------------

12           DEPOSITION OF CAITLIN HOWARD

13                  JUNE 4, 2015

14                   2:30 p.m.

15   ----------------------------------------------

16   PURSUANT TO NOTICE, the deposition of CAITLIN

17   HOWARD was taken on behalf of the Plaintiff,

18   pursuant to the Colorado Rules of Civil Procedure,

19   at 215 West 10th Street, Pueblo, Colorado, this

20   date at 2:33 p.m., before Janice Doyle, a

21   Certified Court Reporter and a Notary Public.

22

23

24

25
```

MEEK & ASSOCIATES (719) 542-1010
meekreporting@yahoo.com



DEFENDANT'S EXHIBIT A

DEPOSITION OF CAITLIN HOWARD

Page 3

| | EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|---|
| | 1 | Hand-drawn Diagram | 33 |

Page 4

WHEREUPON, the following proceedings were had:

IT WAS STIPULATED AND AGREED that the within proceedings were taken pursuant to the Colorado Rules of Civil Procedure.

WHEREUPON,

CAITLIN HOWARD,

the witness herein, having been first duly sworn by the notary public, was examined and testified as follows:

EXAMINATION
BY MR. VIORST:

Q  Good afternoon.
A  Hi.
Q  Could you state your name and spell your last name, please?
A  Caitlin Howard, and it's H-O-W-A-R-D. I was formally Graziano.
Q  Okay. You're already throwing me for a loop here. All right. So are you recently married?
A  Yes.
Q  Okay. When did you get married?

Page 5

A  September of 2014.
Q  All right. Congratulations. All right. So your name is no longer Graziano.
A  Right.
Q  All right. So -- and are you a law enforcement officer?
A  Yes.
Q  Where are you employed?
A  Pueblo County Sheriff's Office.
Q  How long have you been so employed?
A  Eight years.
Q  And what is your rank?
A  I'm a detective.
Q  All right. So I think for the purposes of today's proceeding, I'll call you either detective or Detective Howard or I may just go with officer sometimes. Officer is okay, isn't it?
A  Yeah. That's fine.
Q  Okay. All right. It's not considered an insult, right?
A  No.
Q  Okay. All right. Okay. So Detective Howard, tell me a little bit about your employment background, please. Let's start with

Page 6

education, I guess. What's your educational background?
A  Did a few years in college and joined the police academy.
Q  Okay.
A  And I've been a cop ever since, since I was 21.
Q  Okay. Are you a Pueblo native?
A  Yes.
Q  Okay. And you've been a police officer since you were 21?
A  Uh-huh.
Q  How old are you now?
A  29.
Q  And so that's all with the sheriff's department, then. Is that right?
A  Yes.
Q  And what was your -- so when you started out, I guess you go to the academy or what?
A  I put myself through the academy.
Q  Okay.
A  You can go to the academy when you're employed. You can work in the jail and get accepted into the academy and they'll pay for it,

DEPOSITION OF CAITLIN HOWARD

### Page 15

1 court too.
2  A  Yes.
3  Q  But there's more stuff you can talk
4 about in a deposition, I guess, than you can at
5 trial. But in any event, you do have to answer
6 with words rather than expressions, like "uh-huh"
7 or "huh-uh" that we might use in everyday
8 conversation. All right?
9  A  Correct.
10  Q  Thank you. That's probably true in
11 court as well.
12    All right. So do you, in fact,
13 recall the incident that brings us here today?
14  A  Yes.
15  Q  Okay. So I guess before I start to
16 ask you specific questions, I'm just going to let
17 you give me a running narrative about that call,
18 how you ended up in that Kohl's parking lot on
19 that day, and what you recall about Ms. Wodiuk
20 being taken into custody.
21  A  So you want all the reasoning why
22 that Kohl's parking lot happened first?
23  Q  Yeah.
24  A  Okay.
25  Q  How did you end up -- why were you --

### Page 16

1 so let's break it into parts. Why were you --
2 what -- what brought you to the Kohl's parking lot
3 that day, Officer Howard?
4  A  An EPO order was signed by Judge
5 Eiler [phonetic] for a psych evaluation for Ms.
6 Heidi Wodiuk.
7  Q  Okay. And I'm sorry. I know a lot
8 of abbreviations, but I don't necessarily --
9  A  Emergency --
10  Q  -- know --
11  A  -- protection --
12  Q  -- EPO.
13  A  -- order.
14  Q  Thank you. I should know that one,
15 actually. All right. So an EPO order was signed
16 by Judge Eiler. District court judge or county
17 court judge?
18  A  She's district, I believe.
19  Q  Okay. That's fine. And you had that
20 -- or somebody had that in their possession?
21  A  Yes.
22  Q  Who was -- who was sort of the
23 commanding officer of this -- I mean, how many
24 officers were there with you?
25  A  Sergeant Dave Clements, Sergeant

### Page 17

1 Shelley Bryant, Detective Michael Borders,
2 Detective James Keen, and myself.
3  Q  And who was sort of the -- who was
4 running the show?
5  A  It was decided -- we always have,
6 like, one person --
7  Q  Right.
8  A  -- talking. So Sergeant Dave
9 Clements was going to take the lead on that.
10  Q  Okay. Is that C-L-E-M --
11  A  C-L-E-M-E-N-T-S.
12  Q  Okay. So sergeant, you said?
13  A  Uh-huh.
14  Q  So Sergeant Clements --
15  A  He's now a lieutenant, but he was a
16 sergeant --
17  Q  Okay.
18  A  -- then.
19  Q  So Sergeant Clements was sort of in
20 charge.
21  A  Yes.
22  Q  And he -- did he call you up and say,
23 you know, company meet on this? Or how does it
24 end up that -- how are the officers chosen to go
25 to that assignment?

### Page 18

1  A  Well, then you would need background.
2 That's how we got there to the Kohl's parking lot.
3  Q  Okay.
4  A  And how we got there was I do crime
5 scene investigations, but I also handle a caseload
6 of sex assaults, and I'm a forensic interviewer.
7 So there was a report that Ms. Heidi Wodiuk
8 claimed that her father sexually assaulted her,
9 and I got assigned the case. So I had no idea --
10 I didn't know Heidi Wodiuk before that day I got
11 assigned the case.
12    I attempted to call her, like I would
13 any victim, and say, I'm in charge of your case.
14 I'd like to come and hear what's going on,
15 information. I got her voice mail, which was
16 really concerning to me. I can't remember the
17 exact words, but she sounded very upset on it,
18 saying that she no longer was taking clients, she
19 didn't want to talk to anybody. Basic runaround.
20 And I think that's recorded in evidence.
21    I was worried, so deputies went down
22 to do a welfare check on her. And when they
23 couldn't find her, I then contacted the parents,
24 because I didn't know -- you know, I didn't have
25 any other connections but what she had reported

DEPOSITION OF CAITLIN HOWARD

Page 19

1 originally with the sex offense, and I was
2 concerned about her. They told me that they
3 needed to come in and talk to me about her. So
4 with an open mind, I brought them in, and I
5 interviewed Joe Wodiuk, Jill Wodiuk, and Luke
6 Wodiuk separately.
7 And they were just saying that, you
8 know, how she is an amazing person, but lately
9 she's been off. And then they started going into
10 all these behaviors. And really, from a law
11 enforcement standpoint, unless they are going to
12 -- you know, we get involved if somebody has a gun
13 or saying they're suicidal, and it's intermediate.
14 But they were having other concerns other than
15 suicide.
16 And there's nothing I can -- I can't
17 do -- I could go take her for a psych evaluation,
18 but she would only have a 24-hour one, if I just
19 did that. If a family came up and they filed for
20 an EPO order, then it's a -- usually like a
21 72-hour hold to get a psych evaluation. So I told
22 them I -- we can't be involved in that.
23 Obviously, I had to write reports on
24 our interviews and stuff like that, so that was
25 available to them about what they said. But it

Page 20

1 was on their testimony alone. So they came and
2 they got the emergency protection order with the
3 county attorney, and they went and got it signed
4 and brought that to us.
5 Detective Mike Borders is part of our
6 civil unit who would go and serve that, but
7 because we didn't know where Heidi was and stuff
8 like that, you know, we all went together. And it
9 was just basically the people in our office at
10 that time, at that moment. We just went.
11 Q Just went where?
12 A To go serve the order that was signed
13 by the judge.
14 Q Okay.
15 A The EPO order.
16 Q Okay. All right.
17 A It wasn't like they were hand picked
18 or anything. It was --
19 Q But how did you end up at Kohl's,
20 though? I mean, how did you know she was there or
21 how --
22 A We didn't know where she was. They
23 had -- and this is -- I can't recall exactly. I
24 know that somebody went out to her house. I know
25 that deputies or we sent patrol to see if she was

Page 21

1 home. She wasn't. And then that's when her
2 brother, Luke, had called Sergeant Bryant and said
3 she's at Kohl's -- she's at Kohl's parking lot.
4 So that's how we got to Kohl's parking lot.
5 Q Gotcha. All right. So before we get
6 into, I guess, the facts of this specific case,
7 let me just follow up on something you mentioned a
8 few moments ago. You were the investigating --
9 were you a detective at that time or were you --
10 A Uh-huh.
11 Q Okay.
12 A Yes.
13 Q Thank you. So you were the
14 investigating detective for the sex assault
15 allegations that she had made, I guess at some
16 point a few weeks earlier?
17 A Correct.
18 Q Okay. Did you, Detective Graziano,
19 ever follow up on that or is that something that
20 just kind of got dropped?
21 A After the incident at Kohl's parking
22 lot and she was so angry towards me, we tried to
23 give it to another detective to go follow up with
24 her. I don't know what happened. That case got
25 pulled from me --

Page 22

1 Q Okay.
2 A -- so I can't tell you what happened
3 after that.
4 Q I see. So you -- okay. But when you
5 met with her dad, Joe Wodiuk -- and I understand
6 initially he came in to discuss, I guess, his --
7 your concerns about her mental health. Right?
8 A (Nodded.)
9 THE COURT REPORTER: You're nodding.
10 THE WITNESS: Yes.
11 MR. VIORST: Thank you.
12 THE WITNESS: Sorry.
13 Q BY MR. VIORST: You didn't interview
14 him about the -- her allegations at that time?
15 A Yes, I did.
16 Q Oh, you did.
17 A I did ask him about that, and he had
18 no idea. He said he had no idea what was going
19 on.
20 Q Okay.
21 A But, obviously, I wouldn't close a
22 case just based on the suspect's --
23 Q Understood.
24 A -- word, you know.
25 Q Right.

DEPOSITION OF CAITLIN HOWARD

### Page 23

1  A   Our hopes -- our hopes originally
2  were to get her a psych evaluation, and if they
3  cleared her in the state hospital and said she was
4  fine, because her family was making all these
5  allegations towards her -- and I didn't know her
6  -- that once she was fine and deemed okay that I
7  could bring her in for an interview, and that
8  would be totally out of the question. How could
9  you argue when she'd had a psych evaluation and
10 she's completely fine?
11 Q   Right.
12 A   But it didn't go that way --
13 Q   Okay.
14 A   -- obviously.
15 Q   How did it go?
16 A   Well, she was angry with me after the
17 incident at Kohl's --
18 Q   Okay.
19 A   -- so there was never -- and I got
20 the case pulled from me --
21 Q   I see.
22 A   -- so I never --
23 Q   I see.
24 A   -- got to continue with that case.
25 Q   I see what you're saying. Gotcha.

### Page 24

1  All right. As far as the follow-up on that set of
2  allegations, you don't know what happened?
3  A   I'm unsure. Yeah.
4  Q   Okay. That's fine. All right. So
5  July 22nd, 2013, Luke Wodiuk tells you she's at
6  Kohl's. Sergeant --
7      MR. LANE: Objection. Form.
8  Q   BY MR. VIORST: Isn't that right?
9  Luke Wodiuk tells you she was --
10     MR. LANE: I think she -- her
11 testimony was that Luke Wodiuk told somebody else
12 she was at Kohl's.
13     THE WITNESS: Yes.
14 Q   BY MR. VIORST: I'm sorry. Officer
15 Clements rounds up four additional officers, I
16 guess, to go over there with him. Is that right?
17 Or how does that --
18 A   Yeah. I'm sorry. I'm going to have
19 to do it again. Sergeant Clements, Sergeant
20 Shelley Bryant, Michael Borders, Detective Michael
21 Borders, Detective Jim Keen, and me.
22 Q   Right. So, I guess five total.
23 A   Yeah. So, you're right.
24 Q   Sergeant Clements and four --
25 A   Yeah.

### Page 25

1  Q   That's fine. All right. So you all
2  go to the Kohl's parking lot, kind of stick it
3  out, I guess, till Ms. Wodiuk comes out. Is that
4  right? Were you waiting for a few minutes before
5  she arrived or --
6  A   Yes.
7  Q   Okay.
8  A   It was decided not to go in.
9  Q   All right. So how long were you
10 waiting out there?
11 A   Approximately, probably five, ten
12 minutes.
13 Q   All right.
14 A   I'm unsure --
15 Q   That's fine.
16 A   -- of the exact time.
17 Q   Now, she indicated that you all were
18 in unmarked cars and unmarked uniforms. Is that
19 accurate or inaccurate?
20 A   We dress in plain clothes, but one of
21 us always puts on a vest. We didn't think at that
22 time, like, she would have weapons on her or
23 anything like that. So not all of us vested up.
24 But Sergeant Dave Clements, the point of contact,
25 did throw on his vest that is labeled -- his

### Page 26

1  tactical vest. It says "sheriff" across it.
2  Q   Okay. So he had on a vest. Everyone
3  else -- underneath he had plain clothes, right?
4  A   Right.
5  Q   And everyone else just had plain
6  clothes?
7  A   Yes.
8  Q   Okay. And then are you in marked
9  units or unmarked units?
10 A   Unmarked.
11 Q   Okay. So to the extent that Ms.
12 Wodiuk has stated that it wasn't immediately clear
13 to her whether you were police officers or
14 muggers, I mean, that is something that is
15 plausible. Right?
16     MR. LANE: Objection. Form. Go
17 ahead.
18 Q   BY MR. VIORST: You can answer.
19 A   They -- when we -- you want me to
20 tell the narrative, like a narrative --
21 Q   Just --
22 A   -- of like --
23 Q   Just answer that question and then
24 we'll move on.
25 A   Okay. It was verbally identified to

DEPOSITION OF CAITLIN HOWARD

27

1 her that sheriff's office --
2   Q   Okay.
3   A   Yeah. Multiple times.
4   Q   All right. As long as you believe
5 that person is telling the truth when they say
6 that, then I guess it's true.
7   A   Correct.
8   Q   There are people who say they're
9 sheriffs when they are not. Right?
10      MR. LANE: Same objection.
11      THE WITNESS: Correct.
12   Q   BY MR. VIORST: I mean, there is a
13 crime for impersonating a police officer, right?
14   A   Correct.
15   Q   All right. So -- so you saw -- I
16 don't know if you saw Ms. Clements' [sic] drawing.
17 Is it around here somewhere? And I don't even
18 know if you agree with it or not, but she
19 indicated there was a male who was sort of leading
20 the charge, if you will. Would that have been
21 Sergeant Clements?
22   A   Yes.
23   Q   Okay.
24   A   But the rest of the positionings and
25 everything is wrong.

28

1   Q   Okay.
2   A   Yeah.
3   Q   All right. Well, you know what? I'm
4 going to have you draw a counter drawing then.
5 But before we do that, just -- so go ahead and
6 tell me now, I guess, your narrative recollection
7 of, you know, how it all -- how the arrest went
8 down.
9   A   So we saw Ms. Wodiuk walking to her
10 vehicle. She got around to, like, back driver or,
11 like, you know, the back driver area almost to her
12 car door, and that is when Sergeant Shelley Bryant
13 pulled her vehicle. And she was up front the
14 vehicle -- you know, her vehicle was here
15 (indicating). She was up front. Detective Mike
16 Borders came and pulled his vehicle right here
17 (indicating).
18      Sergeant Dave Clements had his
19 vehicle more towards the side, and then we all got
20 out. Sergeant Dave Clements was saying, "Ms.
21 Heidi Wodiuk, sheriff's office. It's the
22 sheriff's office. Come here."
23      She got into -- before he could even
24 get out, like, the second or third verbal, you
25 know, she opened up the car door and got inside

29

1 and locked the door. He approached the vehicle.
2 Sergeant Shelley Bryant was standing right next to
3 him, and they were telling her, you know, "We have
4 an order -- an EPO order. We have to take you to
5 the state hospital. We're the sheriff's office."
6      She was acting like she couldn't
7 hear. I remember briefly like -- I remember
8 vaguely I was standing towards the back of Ms.
9 Wodiuk's vehicle, and I remember them saying, you
10 know, "Roll down your window. Just come out and
11 speak to us." And giving her verbal commands.
12      She then turned the vehicle on and
13 attempted to back into Detective Mike Borders'
14 car. The window -- they told her stop the car,
15 stop the car. She did. She stopped the car. She
16 rolled down the window a little bit, like about
17 that much (indicating). And I couldn't see
18 everything because of where I was standing. I was
19 towards the back of her vehicle but not directly
20 behind it. It was more off to a little bit of an
21 angle.
22      She put her -- Sergeant Shelley
23 Bryant reached in when he rolled down the window a
24 little bit, and she was trying to get her keys to
25 turn the vehicle off so we didn't have, like, a

30

1 vehicle crash or anything like that. Sergeant
2 Dave Clements grabbed ahold of the window because
3 he saw Sergeant Bryant's arm in there, and he was
4 trying to pull the window down because he was
5 afraid she was going to roll the window up.
6      I remember Sergeant Bryant saying,
7 "She's got my arm." And then the next thing I
8 know -- because I didn't see everything -- I know
9 the window -- like the window looked like it gave
10 where Sergeant Clements was holding, and the door
11 opened. Detective Jim Keen pulled Heidi out,
12 cuffed her, and then everything kind of just like
13 calmed down for a minute. And they were all kind
14 of standing maybe like a foot or two away from
15 Heidi's vehicle.
16      And I remember Sergeant Clements
17 explained to her she had the EPO. She was upset,
18 which, you know, she would be. She had no idea we
19 were coming with an EPO order or we were going to
20 see her at Kohl's. He was telling her, "We have
21 an emergency protection order. We have to take
22 you to the state hospital. Who can we get to take
23 -- you know, to get your vehicle? You know, we
24 don't want to leave it here. You know, we don't
25 want to just lock it up in case they try to tow it

9 (Pages 27 to 30)

DEPOSITION OF CAITLIN HOWARD

### Page 31

1   or anything like that."
2           And she told him, "You're a cop.
3   Figure it out."
4           So Sergeant Clements looked at me and
5   said, "Take her to the car. We'll just transport
6   her."
7           So Detective Mike Borders' was at the
8   back, and I went to go escort her around to get
9   into Detective Mike Borders' car. I had her -- my
10  hand on her arm and my other hand was, like,
11  towards the small of her back. And she kept
12  stopping like she didn't want to go. So I leaned
13  into her. She's a lot bigger than me. I leaned
14  into her and was trying to guide her and push her
15  towards the front. Never once did I grab both of
16  her arms or anything like that. I was just
17  guiding her and pushing her. Yes, I was pushing
18  her because she wouldn't walk.
19          And I put myself in a vulnerable
20  situation, and I was right by her hands when I was
21  leaning in. And she grabbed ahold of my stomach
22  from behind and dug her fingernails in. And I
23  said, "Let go," because it hurt. And I was, like,
24  "Let go. Let go." And she dug in harder. So I
25  had nowhere really -- I couldn't really move

### Page 32

1   because she had ahold of me, so I gave her two
2   strikes. And I really couldn't hit anywhere else
3   but right on her side, on her right side of, like,
4   maybe the small of her -- like the back, the right
5   side of her back.
6           And she didn't let go. She kept
7   squeezing harder. I'm still yelling at her, you
8   know, "Let go of me. Let go of me." I go to
9   common peroneal her, which is a knee strike. And
10  normally, it's a distraction technique and it's
11  usually on the side, but because of my angle, I
12  couldn't -- it wasn't effective. I basically just
13  kneed her in the right side of her butt cheek.
14  And it didn't work.
15          And I had -- during this whole
16  movement, we're still moving, and we were right
17  by, like, the back passenger of Detective Borders'
18  car. And Detective Jim Keen had got in on the
19  other side, like through the back driver's side,
20  and he grabbed her and pulled her into the
21  vehicle. And Clements was behind me and pulled me
22  backed and the grip released. And she was in the
23  car, and that was it.
24          Q   All right. So -- thank you. Let's
25  go ahead and break that down for a few minutes.

### Page 33

1           MS. WODIUK: Can I ask you something?
2           MR. VIORST: Not right now. We'll
3   take a break before we finish so you can ask.
4           Q   BY MR. VIORST: So why don't you go
5   ahead and draw the scene, if you could, with the
6   cars and the people and everything, you know, that
7   you've just described. As I understand, you're
8   saying when she came out, your cars, the unmarked
9   units hadn't pulled up yet and they pulled up as
10  she was getting to her car?
11          A   She was approaching like her driver's
12  side, approaching right here (indicating).
13          Q   Okay. So why don't you go ahead and
14  show me where all the units -- where they
15  ultimately parked and then where all the people
16  were.
17          A   (Drawing.) So that's how the
18  vehicles -- oops. Sorry. Dave's. (Drawing.)
19          Q   All right. So there's one in front
20  -- one directly in front and one directly in back.
21  And then --
22          A   He came from --
23          Q   -- Sergeant Clements --
24          A   -- this side (indicating).
25          Q   The side.

### Page 34

1           A   Facing the west.
2           Q   And --
3           A   So this is south (drawing), north
4   (drawing).
5           Q   Show me, then, where were the --
6   where was all the individual people located?
7           A   Okay. Right at the window.
8   (Drawing.) And I'll just put their initials. Is
9   that okay?
10          Q   Yeah, that's fine.
11          A   That's DC for Dave Clements
12  (drawing).
13          Q   Okay.
14          A   Right here was -- I'm going to write
15  SB for Shelley Bryant (drawing).
16          Q   Okay.
17          A   About right here (indicating) was
18  James Keen, so I'm going to put JK (drawing).
19          Q   Okay.
20          A   I was back here further. I'll put CH
21  for Caitlin Howard (drawing).
22          Q   Okay.
23          A   I don't recall where Mikey was. I
24  don't think he was so quick to get out of his car.
25  Because I do recall him moving his car backwards a

10 (Pages 31 to 34)