UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 14-cv-02931-WJM-CBS

HEIDI WODIUK,

    Plaintiff,

v.

PUEBLO COUNTY SHERIFF'S DEPARTMENT OFFICER
CAITLIN GRAZIANO, in her individual and official capacities,

    Defendant.

## MOTION FOR CONTINUED DEPOSITION OF PLAINTIFF HEIDI WODIUK

Defendant, CAITLIN GRAZIANO (now known as Caitlin Howard), in her individual and official capacities, by and through her counsel, Jonathan A. Cross and Sean J. Lane, of CROSS LIECHTY LANE PC, hereby moves this Court to allow Defendant to continue the deposition of Plaintiff, as Plaintiff refused to answer questions regarding several topics of importance to the defense of this matter. As grounds therefor, Defendant states as follows:

### D.C.COLO.LCivR 7.1 CERTIFICATION

Pursuant to D.C.COLO.LCivR 7.1, undersigned counsel has conferred with Plaintiff's counsel regarding this Motion. Plaintiff's counsel takes no position with regard to the relief requested by this Motion.

### INTRODUCTION

On June 22, 2013, Defendant was assigned to assist Plaintiff's family who sought an emergency protection order from the Pueblo District Court ordering that Plaintiff be taken into



custody on a 72-hour mental health hold. Once the family got the order signed by a judge, Plaintiff's family informed Sheriff's Deputies that Plaintiff was currently located in the parking lot of a local Kohl's department store. Defendant accompanied several other Pueblo Sheriff's Deputies to that location.

When Sheriff's Deputies approached, Plaintiff locked herself in her vehicle and refused to open the vehicle. Ultimately, Sheriff's Deputies were able to open the vehicle, take Plaintiff into custody and transport her to the Colorado State Hospital for observation.

Plaintiff claims that during the contact with Sheriff's Deputies, she was subject to the use of excessive force. She claims multiple injuries resulting from the alleged use of force which she claims resulted in medical expenses, loss of income, and increased maintenance costs on her rental properties, among other claims.

## MOTION AND ARGUMENT

1.   On June 4, 2015, the deposition of Plaintiff Heidi Wodiuk was taken in Pueblo, Colorado, pursuant to FED.R.CIV.P. 30. The deposition began at 9:00 a.m. on that date and concluded at 2:22 p.m. The deposition was interrupted by a lunch break and several hourly breaks which are noted in the transcript of the deposition.

2.   FED.R.CIV.P. 30(c)(2) states that:

An objection at the time of the examination – whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition – must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

3.  During Plaintiff's deposition, Plaintiff's counsel interrupted questioning and instructed his client not to answer several of defense counsel's questions. Additionally, Plaintiff refused to answer several questions on grounds that another attorney (not her counsel in this case) had advised her not to answer questions about certain topics. These objections/refusals to answer were as follows:

    a.  Plaintiff's counsel objected to questioning regarding the paternity of Plaintiff's child on the basis of relevance, and directed Plaintiff to answer "yes or no", without giving details. *See* Deposition of Heidi Wodiuk (hereinafter, "Exhibit A"), June 4, 2015, at 57:10 to 58:15;

    b.  Plaintiff is apparently claiming lost income and increased maintenance expenses on her many rental properties as a result of the alleged injuries which came from the incident with Defendant. *See* Exhibit A, at 42:20 to 48:2. Plaintiff claims that she is no longer able to maintain the properties and has to pay people to do general maintenance, and that her general income has been reduced. Plaintiff has recently transferred sole ownership of her properties and is allegedly now sharing ownership with a man named Michael Franti, who resides in California. Defense counsel was not permitted to inquire into this situation, as Plaintiff stated that she would have to have her other attorney (Ralph Lamar) present for those types of questions, as there were potential criminal charges pending regarding the alleged transfer of the properties. Ultimately, Plaintiff exerted her Fifth Amendment rights on this issue and would not answer

3

questions, although it is unclear whether there actually were pending criminal charges at that time. *See* Exhibit A, at 209:6 to 220:25.

4. Both of these issues were relevant to Plaintiff's claims and to the deposition, and were necessary for discovery to properly proceed in this matter, as follows:

    a. The paternity of Plaintiff's child is important in this matter. First, as *res gestae* regarding the reason why Defendant was in contact with Plaintiff in the first place as Plaintiff's family had sought a mental health hold on Plaintiff because she was making claims, among other things, that her child was actually fathered by Michael Franti (a popular singer, residing in California) who, based upon information and belief, Plaintiff had never met in person. Plaintiff's family had become concerned that Plaintiff was having mental health issues because of these claims of paternity, as well as other actions and statements they allege Plaintiff was making at the time of her contact with Defendant, and continuing until the present. Second, because it goes to Plaintiff's overall credibility in this matter, as Mr. Franti denies ever meeting Plaintiff, and many things in Plaintiff's life seem to focus on her "relationship" with Mr. Franti.

    b. With respect to questions about the ownership of Plaintiff's rental properties, this goes directly to both Plaintiff's claimed damages, as well as her credibility. Apparently, Plaintiff has recently transferred title in her rental properties to include both herself and Michael Franti. Plaintiff claims that Mr. Franti paid her no money for this transfer, but claims it

was done for mutual "protection of assets". *See* Exhibit A, at 219:17 to 220:9. Given Plaintiff's claims in this matter, it is highly relevant (and most likely admissible) whether Mr. Franti did, in fact, agree with Plaintiff to a mutual protection of assets and what portion (if any) of the maintenance costs are being borne by Mr. Franti. Further, if Plaintiff is not being truthful about this transaction with Mr. Franti, it goes to her credibility regarding her claimed damages, as well as all other aspects of this case.

5. In general, "[p]arties may obtain discovery regarding any nonprivleged matter that is relevant to any party's claim or defense", and this "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED.R.CIV.P. 26(b)(1).

6. "Under the plain language of Fed.R.Civ.P. 30(d)(1), counsel may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the court, or to suspend a deposition in order to present a motion under Fed.R.Civ.P. 30(d)(3). It is inappropriate to instruct a witness not to answer a question on the basis of relevance." *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995).

7. Both of the designated areas of inquiry are relevant to Plaintiff's claims, and the defense against those claims. Though they do not appear to touch directly on the allegations of excessive force, there are serious questions in this matter regarding Plaintiff's credibility that are wrapped up in these areas of inquiry. Perhaps even more importantly, both issues go to the *res*

*gestae* of why Defendant was in contact with Plaintiff in the first place, as well as directly addressing Plaintiff's claimed damages in this matter.

WHEREFORE, Defendant respectfully requests that this Court grant her Motion for Continued Deposition of Plaintiff Heidi Wodiuk and allow Defendant to inquire more fully about the areas that her counsel was prohibited from inquiring into on June 4, 2015. In addition, Defendant requests that Plaintiff pay any costs and fees associated with this continued deposition and for any other relief this Court sees fit to to provide.

Respectfully submitted this September 23, 2015.

**CROSS LIECHTY LANE PC**

By: s/ *Sean J. Lane*
Jonathan A. Cross
Sean J. Lane
7100 E. Belleview Ave., Suite G-11
Greenwood Village, Colorado 80111
Tel: (303) 333-4122
Emails:   jcross@crossliechty.com
          slane@crossliechty.com
ATTORNEYS FOR DEFENDANT GRAZIANO

## CERTIFICATE OF SERVICE

I hereby certify that on this September 23, 2015, a true and correct copy of the above and foregoing **MOTION FOR CONTINUED DEPOSITION OF PLAINTIFF HEIDI WODIUK** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Anthony Viorst, Esq.
VIORST LAW OFFICES
950 South Cherry St., Suite 300
Denver, CO 80246
*Attorneys for Plaintiff*

*A Duly Signed Original is on File at the Offices of Cross Liechty Lane PC*

s/   *Linda L. DeVico*

DEPOSITION OF HEIDI WODIUK

### Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 14-cv-02931-WJM-CBS

-------------------------------

HEIDI WODIUK,
    Plaintiff,
v.
PUEBLO COUNTY SHERIFF'S DEPARTMENT
OFFICER CAITLIN GRAZIANO, in her
individual and official capacities,
    Defendant.

-------------------------------

DEPOSITION OF HEIDI WODIUK
JUNE 4, 2015
9:00 a.m.

-------------------------------

PURSUANT TO NOTICE, the deposition of HEIDI WODIUK was taken on behalf of the Defendant, pursuant to the Colorado Rules of Civil Procedure, at 215 West 10th Street, Pueblo, Colorado, this date at 9:14 a.m., before Janice Doyle, a Certified Court Reporter and a Notary Public.

### Page 2

```
 1         APPEARANCES
 2  For the Plaintiff:
 3  ANTHONY VIORST, ESQ.
    Viorst Law Offices
 4  950 South Cherry Street, Suite 300
    Denver, Colorado 80246
 5  (303) 759-3808
    E-mail: tony@hssspc.com
 6
 7  For the Defendant:
 8  SEAN L. LANE, ESQ.
    Cross Liechty Lane P.C.
 9  7100 East Belleview Avenue, Suite G-11
    Greenwood Village, Colorado 80906
10  (303) 333-4122
    E-mail: slane@crossliechty.com
11
12  Also Present: Ms. Caitlin Howard
13
14
15            INDEX
16
17
18
19
20
21  DEPOSITION WITNESS:            PAGE
22  HEIDI WODIUK
23    Examination by Mr. Lane        4
24    Examination by Mr. Viorst    221
25    Examination by Mr. Lane      233
```

### Page 3

```
 1  EXHIBIT    DESCRIPTION              PAGE
 2  1   Hand-drawn Diagram              175
```

### Page 4

 1    WHEREUPON, the following proceedings were
 2  had:
 3    IT WAS STIPULATED AND AGREED that the
 4  within proceedings were taken pursuant to the
 5  Colorado Rules of Civil Procedure.
 6
 7    WHEREUPON,
 8        HEIDI WODIUK,
 9  the witness herein, having been first duly sworn
10  by the notary public, was examined and testified
11  as follows:
12
13           EXAMINATION
14  BY MR. LANE:
15    Q  Good morning. Could you please state
16  your name and spell your last name for the record?
17    A  My name is Dr. Heidi Wodiuk. My last
18  name is spelled W-O-D-I-U-K.
19    Q  Okay. And have you ever had your
20  deposition taken before?
21    A  No, sir, I never have.
22    Q  Okay. I'm going to talk to you a
23  little bit, then, about what we're going to do
24  here today. One thing I want to make sure you
25  understand, if you don't understand any question

1 (Pag

DEFENDANT'S
EXHIBIT
A

DEPOSITION OF HEIDI WODIUK

### Page 41

1  able to be run.
2  Q  Okay. Here's what I'm thinking.
3  We're about 50 minutes right now. It's a little
4  early, but I figure let's take a break right now.
5  We're going to be talking a little bit about your
6  medical practice after the break and things like
7  that prior to the incident. And we'll get going
8  from there. Ten minutes. That way --
9  MR. VIORST: Can you show me -- just
10  give me kind of a general sense? I won't hold you
11  to it.
12  MR. LANE: I understand.
13  MR. VIORST: As far as the day
14  goes --
15  MR. LANE: My hope is -- I mean,
16  obviously, we're going to get both of them done
17  today. That's my goal. And, you know, my hope is
18  to be done sometime -- I wouldn't say necessarily
19  -- I'd say early to mid-afternoon. Okay? That
20  would be my hope. And then we can get started --
21  MR. VIORST: That's fine.
22  MR. LANE: Okay.
23  MR. VIORST: Okay. Yeah. And
24  needless to say, my depo won't take as long.
25  MR. LANE: I understand.

### Page 42

1  MR. VIORST: All right.
2  MR. LANE: We can go off the record.
3  (Recess taken from 9:53 a.m. to
4  10:12 a.m.)
5  Q  BY MR. LANE: So you talked about
6  still -- were you still conducting your
7  shamanistic activities and practice, I suppose it
8  would be called?
9  A  Not in a clinical or ceremonial
10  practice.
11  Q  Uh-huh.
12  A  But for, like, friends that would
13  call up and they were struggling and needing some
14  advice or some guidance, then I would -- I would
15  give that.
16  Q  Did you charge for that?
17  A  No, sir.
18  Q  Okay.
19  A  Never.
20  Q  How much do you make monthly from
21  your rental properties?
22  A  Each month varies. As I was just
23  talking to Tony, doing the financial, like,
24  affidavits for you, I'd rather be more specific
25  and precise for you. So if I could, you know,

### Page 43

1  have a few days and get a financial statement for
2  you and kind of do the last -- the last few months
3  or however long you're going to need. Because I
4  haven't even done my taxes right now. I have to
5  file an extension, so I need some time to get all
6  that together. Because I don't want to guess at
7  that because it's very important to the case.
8  So if I can take a little bit of time
9  to put those together for you, I would be happy to
10  do that or if you are willing to agree, but --
11  Q  One of the issues -- obviously, this
12  is kind of my chance to talk with you.
13  A  Well, let me just say this: Before
14  this all happened --
15  Q  Okay.
16  A  -- I was making close to 8 to $10,000
17  a month.
18  Q  Okay.
19  A  And then after this happened, I have
20  pretty much gone down to nothing, so significantly
21  to the fact that I qualify for Medicaid, and I
22  have qualified for food stamps during the first
23  year that I was suffering the injuries. So this
24  has propelled my financial state so drastically
25  that I qualify for government assistance.

### Page 44

1  Q  The 8 to 10,000 you were making a
2  month prior to the July, 22nd, 2013 date --
3  A  And that was a gross. That was
4  not --
5  Q  I understand.
6  A  -- take-home.
7  Q  How much of that came from rental
8  properties and how much came from your practice?
9  A  That, I would have to sit down with
10  my CPA and get all of the numbers from him to be
11  precise, because he did all of that for me.
12  Q  Who's your CPA?
13  A  Jerry Short.
14  Q  Is he local?
15  A  Yes, sir.
16  Q  So after this incident, you claim
17  your income per month has dropped to nothing?
18  A  Pretty much.
19  Q  Pretty much. Let me ask you about
20  the pretty much. What are you getting income from
21  now?
22  A  Just the rental properties and due to
23  that business, because it's its own entity.
24  Q  That business --
25  A  I'm not taking any personal income

11 (Pages 41 to 44)

DEPOSITION OF HEIDI WODIUK

Page 45

1 from that property. So right now, at this time,
2 I'm not taking a personal income. So if you're
3 aware of how businesses are run, you have to write
4 yourself a check from the business, and I'm not
5 taking any money. At this point, there's no
6 money.
7    Q   From which business?
8    A   All of the rental is sustaining its
9 basic survival needs for those properties, and
10 I've had to take significant losses on my
11 properties, as well, and maintenancing [sic] them
12 and things like that. So it's basically just
13 maintaining the bare necessity at this time.
14    Q   How has that changed from before the
15 incident with respect to the amount of --
16    A   How much it's changed, I was
17 personally in my private practice, and I was able
18 to do my repairs myself, so I could save the money
19 that way. And now, after July 22nd, 2013, I have
20 had to have William Hayes and Bob Heiser. I've
21 had to have my uncles, several people come over
22 and do repairs for me, the repair companies,
23 because I'm not -- I was not physically able to do
24 those.
25    Q   And do you attribute the fact that

Page 46

1 you're not making any money from the rental
2 properties to the fact that you're having other
3 people do repairs for you?
4    A   Due to the nature that I did save
5 money doing the work myself, yes. And I also put
6 in my own money that I made in the clinic to
7 repairs and different things of that nature, as
8 well. So, you know, I'm barely getting by with
9 this.
10    Q   Do you pay William Hayes to do
11 repairs on your property?
12    A   No. Right now --
13    Q   Do you pay -- sorry. Go ahead.
14    A   He has been tallying his costs for
15 this lawsuit.
16    Q   Is one of the costs he's tallying
17 repair costs?
18    A   Yes, sir.
19    Q   How about Bob Heiser?
20    A   Yes.
21    Q   Who is he?
22    A   And several of the companies that
23 I've had to use are working with me in paying
24 them. So, like, Cut Rate Sewer and Drain, furnace
25 company, they've all been very lenient with me due

Page 47

1 to this situation that I'm in and allowing me to
2 make payments. Most people don't allow you to do
3 that. But I've had to gradually pay these people,
4 and I have never had to do that before.
5    Q   Who is Bob Heiser? You say the name
6 Bob Heiser.
7    A   Bob Heiser is a handyman.
8    Q   Okay. Do you pay him to do repairs?
9    A   Yes, sir.
10    Q   And do you have receipts or anything
11 along --
12    A   Yes.
13    Q   Okay. Other than William Hayes and
14 Bob Heiser, who have you paid to do repairs on the
15 properties?
16    A   The Tin Man.
17    Q   Okay.
18    A   I have also Cut Rate Sewer and Drain.
19    Q   Okay.
20    A   Trying to think who else that I've
21 had to come over to do other things. There's
22 several others. I'd have to pull out the receipt.
23 I've saved all of them.
24    Q   So in terms of payment on this, have
25 the rental amounts that you've been getting from

Page 48

1 your properties, has that changed?
2    A   Yes.
3    Q   Okay. When did that change?
4    A   If you're not familiar with rental
5 businesses, your money is not always confirmed
6 because you're relying on somebody to pay their
7 rent.
8    Q   Okay.
9    A   So some of my tenants are equally
10 struggling. Some months I'd get full rent; some
11 months I don't get any rent. Some of these
12 tenants have been with me for six years, and I'm
13 willing to work with them, as well. So each month
14 varies in what's going on. And usually, they'll
15 pay, but there are times where some people have
16 gotten thousands of dollars behind, and I have to
17 evict them. I have to go into the property and
18 there's damages.
19        So here it looks like one month, oh,
20 you've made this profit, but then it evens out to
21 where you've evicted, and now you gotta go in and
22 do carpet. You gotta paint. You gotta do holes.
23 Now your profit is gone. Do you see? So that's
24 where it takes a good accountant to see what the
25 scales really are in the business. But you just

12 (Pages 45 to 48)

DEPOSITION OF HEIDI WODIUK

Page 57

1  biological testing.
2     Q  Okay.
3     A  No biological testing has been done
4  to confirm biological DNA. So, therefore, by
5  medical standards, it's an acceptance of
6  fatherhood. Okay?
7     Q  Uh-huh.
8     A  I'm just giving a medical -- a
9  medical terminology for that. That's it.
10    Q  Is there anyone else you suspect may
11 be the father?
12    A  Not at this time.
13    Q  Again, you know, because it was
14 alleged, was there somebody else who could be the
15 father?
16    A  There could be.
17    Q  Okay. Do you know who that would be?
18    A  I'm not supposed to discuss anything
19 at this time right now as there is an
20 investigation in the case going.
21       MR. VIORST: I'm going to object. I
22 mean, we were getting outside the bounds of
23 relevance here and into sort of personal matters.
24       MR. LANE: I mean, I think some
25 personal matters may come into it. I think to

Page 58

1  some extent, it goes to credibility, especially
2  with respect to her claims in this case. I
3  understand what you're saying, but what I'm saying
4  is: There are some credibility issues here that
5  are going to come out.
6        MR. VIORST: Maybe. But who she was
7  sleeping with?
8        MR. LANE: I'm just asking. I
9  understand what I'm asking is --
10    Q  BY MR. LANE: Is there someone else
11 who could be the father?
12       MR. VIORST: Just answer yes or no.
13 That's it.
14       MR. LANE: Yeah.
15       THE WITNESS: No.
16    Q  BY MR. LANE: Okay. Since -- through
17 the operation of your practice, you have the
18 rental properties and you have the practice that
19 you operated. Okay? Have you had any other jobs
20 that you've worked between --
21    A  I was a substitute teacher --
22    Q  Okay.
23    A  -- for District 60.
24    Q  How long were you a substitute
25 teacher?

Page 59

1     A  For a few years. I was a substitute
2  -- well, I held a license for probably about four
3  or five years.
4     Q  Uh-huh.
5     A  Didn't always work every day, but I
6  did maintain my license. I did let it expire this
7  last -- this last year. And then I did teach some
8  classes.
9     Q  Uh-huh.
10    A  So CEU classes.
11    Q  And you were paid for that?
12    A  Yes. And that was in 2011. That was
13 way before this incident, so I don't know how that
14 will relate to this.
15    Q  Okay.
16    A  To show that I did have a nice income
17 before all of this happened.
18    Q  When you were teaching, do you know
19 how much you were being paid for a class?
20    A  When I was teaching for District
21 60 --
22    Q  Okay.
23    A  -- as a substitute?
24    Q  As a substitute.
25    A  That's only $70 a day.

Page 60

1     Q  Okay.
2     A  That's not much.
3     Q  And then you said you were doing some
4  teaching for a college?
5     A  No, not for a college.
6     Q  I'm sorry.
7     A  I did some seminars on my own --
8     Q  Okay.
9     A  -- on my own groups, and I would have
10 to give you, like, the dates and, like, the
11 attendance and different things that were
12 happening. Offhand, that's so far back that I
13 don't -- I don't have much with me. So to ask me
14 would just be a wild guess.
15    Q  Okay.
16    A  Because that was in 2011.
17    Q  Is there any reason that you can't
18 teach now?
19    A  The only reason I haven't taught now
20 is because my pain will get so significant that
21 there's times I can't get out of bed. The hip
22 won't sustain me for a long period of time. It
23 starts getting inflamed. I have such gluteus
24 maximus -- gluteus medius tears and greater
25 trochanter tears, which is basically the

15 (Pages 57 to 60)

MEEK & ASSOCIATES   (719) 542-1010
meekreporting@yahoo.com

DEPOSITION OF HEIDI WODIUK

### Page 209

1  Q  Oh, okay. So he's in the state, but
2  he's just out of town.
3  A  Yeah.
4  Q  Did you and Sam ever live together?
5  A  No.
6  Q  Okay. Talking a little bit earlier
7  in terms of your income right now -- told you I
8  might be going back to that a little bit. In
9  terms of your income right now, you basically --
10  you say that you're not drawing a check from your
11  rental properties. Right?
12  A  Uh-huh.
13  Q  How are you -- how are you living
14  right now? I mean, where are you getting money
15  from?
16  A  Pretty much, the basis of the rentals
17  are paying just the basic bills. So they are
18  paying the mortgages and I have enough for gas.
19  I've even had to borrow money from William and
20  Sam. Sam's been buying groceries. And that's
21  about it.
22  Q  Okay. In terms of your rental
23  income, are you the sole owner of all of the
24  rental properties?
25  A  I was until recently.

### Page 210

1  Q  Who else owns the rental properties
2  now?
3  A  Michael Franti. He is on the title.
4  I own the rental properties, but he's on the
5  title.
6  Q  Did you reach any kind of a deal with
7  him to pay you for that?
8  A  I'm not at liberty to discuss any of
9  those matters at this time. I've been threatened
10  that -- by Mark Meyers, another sheriff officer,
11  that he's trying to pull some fananigan [phonetic]
12  bullshit on me. So --
13  Q  Well, okay. At least with respect to
14  this, I mean, it is a source of income.
15  Apparently, it's a source of income that you may
16  be sharing with somebody, so I need to know about
17  it.
18  A  Uh-huh.
19  Q  Now, if you're saying you won't
20  answer the question --
21  A  So at the time of the brutality, all
22  of the property was owned by me.
23  Q  Okay.
24  A  And all the income was done by me.
25  Due to the extreme terrorizing that has occurred

### Page 211

1  by the sheriff's department and the extreme
2  illegal conduct that has occurred --
3  Q  Okay.
4  A  -- there is another case on the other
5  mishaps and civil right violations. So any other
6  additional information relating to those specific
7  things you're wanting, you'll have to have my
8  other attorney present because he's addressing
9  those matters. And I know it seems weird. You're
10  wondering how those two relate.
11  Q  Uh-huh.
12  A  But they -- the sheriff's department
13  put me on a mental hold lying to say -- for
14  forgery and stuff, which they won't even produce.
15  And so I'm not at liberty to discuss anything,
16  because they have failed to provide any
17  information. So I don't want to be -- sound like
18  I'm --
19  Q  So --
20  A  -- wanting to help you here and
21  address the situation, but --
22  MR. LANE: So, Mr. Viorst, I mean, is
23  she taking the Fifth on this? I mean, she's not
24  answering it. She says that she won't answer it.
25  What is the situation on that?

### Page 212

1  MR. VIORST: Apparently, there's some
2  name on her title.
3  MR. LANE: Michael Franti is the name
4  on the title.
5  THE WITNESS: It's public record.
6  MR. VIORST: Some criminal
7  investigation. Some other person got added to the
8  title. I don't know exactly.
9  MR. LANE: Okay. I mean, I think I'm
10  entitled to ask about it in that it's a source of
11  income. I don't know if maybe you want to have a
12  meeting with her and we can take a break.
13  MR. VIORST: No. I mean, it's a
14  source of income. I -- just stay away from the
15  title issue. I mean --
16  MR. LANE: Well, I think the
17  ownership of those rental properties is a big deal
18  because she's saying she's lost the money from
19  those rental properties.
20  MR. VIORST: From this incident?
21  MR. LANE: That's what she said
22  earlier. She said that since this incident --
23  THE WITNESS: No.
24  MR. LANE: -- she can't maintain
25  them.

53 (Pages 209 to 212)

DEPOSITION OF HEIDI WODIUK

### Page 213

1  THE WITNESS: I'm sorry, sir. You
2  misunderstood me. Because the income that I've
3  lost is my private practice.
4  MR. LANE: Uh-huh.
5  THE WITNESS: And so the only income
6  that's coming in is the rental property.
7  MR. LANE: Right.
8  THE WITNESS: And the income that
9  I've lost -- so I want to reiterate so you get
10 this straight. The income that I have lost is the
11 ability for myself to do the maintenance on my
12 properties that saved me the money so I could take
13 personal money from the rental properties.
14  Q  BY MR. LANE: And my recollection of
15 your testimony is that because of your injuries
16 you're now having to pay people to take care of
17 those properties --
18  A  Right.
19  Q  -- which is involving from that.
20  A  Right.
21  Q  My concern is is that maybe someone
22 else is taking income from them or --
23  A  No one else is taking income from
24 them.
25  Q  Okay.

### Page 214

1  A  And they -- all the other information
2  you need on the properties is public record on the
3  public assessor's page.
4  Q  As to when the title was --
5  A  Yes.
6  Q  -- changed?
7  A  And who all owns them.
8  Q  Did you receive any money from
9  Michael Franti for those properties --
10 A  No, sir.
11 Q  -- to gain an ownership interest?
12 A  No, sir, none.
13 Q  Okay. And was that some kind of a --
14 because that name obviously has come up before.
15 Was that some kind of a prank you were playing on
16 your father, Joe?
17 A  Why would I do a legal prank --
18 Q  I don't know.
19 A  -- that would --
20 Q  I'm asking.
21 A  -- get me in trouble?
22 Q  Okay.
23 A  No.
24 Q  So, I mean, again, if there's no
25 money transferred, why is there a transfer of

### Page 215

1  title on your rental properties?
2  A  You'll have to speak with Ralph
3  Lamar.
4  Q  Okay.
5  A  That's irrelevant to me getting beat
6  up.
7  MR. VIORST: I don't know.
8  MR. LANE: Well, to some extent, I
9  think it's relevant to the monies -- I'm sorry,
10 Tony. I didn't mean to cut you off.
11 MR. VIORST: I don't know. I mean, I
12 guess at this point, you know, I'm going to say
13 that we'll instruct her not to answer. If you
14 need to reopen on this issue, I'm not saying it's
15 irrelevant like the other thing that wasn't
16 relevant. But --
17 MR. LANE: I disagree with that, but
18 I understand.
19 MR. VIORST: I'm not saying this is
20 irrelevant, but I am saying that, you know, there
21 is some investigation going on. I don't know
22 exactly what it's about. But I'll just say --
23 MR. LANE: You understand that --
24 MR. VIORST: -- I don't want her to
25 incriminate herself.

### Page 216

1  THE WITNESS: Right.
2  MR. LANE: Okay. So, I mean, that
3  was my question. Is she taking the Fifth on this
4  issue?
5  MR. VIORST: Yes.
6  THE WITNESS: Yes.
7  MR. LANE: Okay. Obviously, this is
8  something I'm going to want to look into in the
9  future.
10 MR. VIORST: I think there's an
11 investigation.
12 MR. LANE: Let me make my record at
13 least with respect to right now.
14 MR. VIORST: Okay.
15 MR. LANE: I wanted to ask about
16 Michael Franti and why he has an ownership
17 interest in the properties that she said --
18 MR. VIORST: No.
19 MR. LANE: Just let me make a record.
20 MR. VIORST: Sorry.
21 MR. LANE: That she says she draws
22 income from, or at least she did that she says now
23 she doesn't get any income from because she's
24 having to pay additional costs on those properties
25 based on this incident. Okay? And she said she

DEPOSITION OF HEIDI WODIUK

Page 217

1  -- well, she says there's been no money
2  transferred, but apparently, the title is in her
3  name and Michael Franti's name. Okay? And she
4  won't answer any further questions on Michael
5  Franti or any of those ownership interests.
6         MR. VIORST: Correct.
7         THE WITNESS: That's correct.
8         MR. LANE: Okay.
9         MR. VIORST: Yeah. I don't know that
10 there's any nefarious motive. I think it's more
11 of a -- sort of a fatal attraction situation.
12 I don't really know. But let's stay away from it.
13 Okay?
14        MR. LANE: Well, I mean -- and that
15 could come in with respect to credibility --
16        MR. VIORST: Okay.
17        MR. LANE: -- later on. So that's --
18 understand, I'm making my record because I may
19 need to revisit this.
20        MR. VIORST: I understand.
21        THE WITNESS: I don't see how we can,
22 if --
23        MR. LANE: You may have to --
24        THE WITNESS: -- there's an active
25 investigation.

Page 218

1         MR. LANE: Well, and you've got a
2  point there, but then --
3         THE WITNESS: And then we have --
4         MR. LANE: -- it could be held until
5  that's all over with and then we come back to this
6  case.
7         THE WITNESS: Right.
8         MR. LANE: Okay? That could happen.
9  I don't know. All right. I need maybe ten
10 minutes to make sure, but I might be done.
11        MR. VIORST: Okay.
12        MR. LANE: Okay?
13        MR. VIORST: Yeah.
14        MR. LANE: And I'm sorry. Tony, did
15 you want to make any further record on your behalf
16 for that?
17        MR. VIORST: No --
18        MR. LANE: Okay.
19        MR. VIORST: -- not at this time.
20 Let's take a break and let me think about it.
21        MR. LANE: Okay.
22        (Recess taken from 1:56 p.m. to
23 2:06 p.m.)
24    Q  BY MR. LANE: With the direction from
25 your counsel to not answer any further questions

Page 219

1  on Michael Franti -- excuse me -- my voice is
2  giving out -- or the ownership of those properties
3  and based on the fact that you understand there's
4  a criminal investigation going on --
5     A  Uh-huh.
6     Q  -- I don't know if there's been any
7  charges. I don't know if there are grounds for
8  the Fifth Amendment violation at this point, but
9  I'm just going to say on the record I do intend to
10 ask about those if the court allows me to.
11    A  And once we figure that out --
12    Q  Okay.
13    A  -- I'll be happy to answer your
14 questions.
15    Q  That's fine.
16    A  I just need to make sure I --
17    Q  But I specifically want to go into
18 those areas and I want to make sure that's on the
19 record. So when we go before the judge on that --
20 and again, a couple of things here, credibility
21 and income and ownership of those properties is
22 apparently one of her big sources of income that
23 fell off after this incident occurred, according
24 to her.
25    A  Well, what I can assure you is that

Page 220

1  he's not taking income from them and he has not
2  paid me income for them.
3     Q  Okay. With the --
4     A  It's a mutual agreement for
5  protection of assets.
6     Q  A mutual agreement for protection --
7     A  Yeah.
8     Q  -- of assets.
9     A  That's all.
10    Q  Okay. So Mr. Franti agreed --
11    A  Yes.
12    Q  -- for protection of the assets.
13 Okay. Are you willing to talk to me any more
14 about that?
15    A  No. Let's see what's going on with
16 other case. And then if I get okay with my other
17 attorney, because we're suiting a lawsuit for
18 things related to that, and then we can remeet if
19 we need to. I'm completely fine with that.
20    Q  Yeah. I mean, again, I don't think
21 it would take particularly long, but I understand
22 your counsel is not allowing you to answer those
23 questions at this time. So given that, I'm done.
24    A  We can come back another date.
25        MR. VIORST: All right.

55 (Pages 217 to 220)

MEEK & ASSOCIATES   (719) 542-1010
meekreporting@yahoo.com